UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - -x

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 9|14|07
```

BRENTWOOD PAIN & REHABILITATION
SERVICES, P.C., HEMPSTEAD PAIN &      :
MEDICAL SERVICES, P.C., and
SIGNATURE HEALTH CENTER, LLC,         :

                Plaintiffs,      :

      - against -            :

ALLSTATE INSURANCE COMPANY, AIU       :
INSURANCE COMPANY, AMERICAN TRANSIT
INSURANCE COMPANY, EAGLE INSURANCE :
COMPANY, HALCYON INSURANCE COMPANY,
LIBERTY MUTUAL INSURANCE COMPANY,     :
LUMBERMENS MUTUAL CASUALTY GROUP,
NATIONAL GRANGE MUTUAL INSURANCE      :
COMPANY, NATIONWIDE MUTUAL
INSURANCE COMPANY, PROGRESSIVE        :
CASUALTY INSURANCE COMPANY,
PROGRESSIVE NORTHEASTERN INSURANCE :
COMPANY, PROGRESSIVE NORTHERN
INSURANCE COMPANY, PROGRESSIVE        :
NORTHWESTERN INSURANCE COMPANY,
PROGRESSIVE SPECIALTY INSURANCE       :
COMPANY, STATE FARM MUTUAL
AUTOMOBILE INSURANCE COMPANY, ST.     :
PAUL TRAVELERS, and JOHN DOE
INSURERS 1-100,                       :

                Defendants.      :

- - - - - - - - - - - - - - - - - - -x

**OPINION**

06 Civ. 3994 (DC)

**APPEARANCES:**      (see last page)

**CHIN, D.J.**

        Since 1896, x-ray technology has enabled doctors to
"see" inside patients' bodies without the risks of surgery.  More
recently, physicians have employed other imaging technologies,
including Magnetic Resonance Imaging ("MRI"), to examine
patients' brains, muscles, and organs without a scalpel or the
risks of anesthesia and infection.

X-ray and MRI technology are both similar and different.  In an x-ray, the image is produced by passing electrons through the body and onto film or a fluorescent light.  The ultimate image, which is essentially a shadow of the body, shows the densest material, bone, as white, and soft tissues -- muscle, fat, and skin -- as gray or black.  In MRI, a strong magnetic field first aligns protons in the body, a pulse of radio waves then mis-aligns them, and the image is produced by picking up the radio signal emitted by the protons realigning.  Soft tissues produce a bright image, while bones appear black.  X-rays take minutes to perform, while an MRI can take an hour or more.  On the other hand, both are diagnostic procedures that produce images of internal parts of the body, and both fall under the branch of medicine termed radiology.

In this case, the issue presented is whether MRIs are covered by regulations that limit the fees that can be charged under the New York no-fault auto insurance law when multiple body parts are imaged in one session.  The New York State Workers' Compensation Board ("WCB"), the New York State Department of Insurance ("DOI"), and the defendants in this case (numerous insurance companies ("Insurers")) would apply the same fee limitations to MRIs as are applied to x-rays under the WCB schedule of medical fees, and adopted by DOI under New York's no-fault statute.  Plaintiffs Brentwood Pain & Rehabilitation Services, P.C., Hempstead Pain & Medical Services, P.C., and Signature Health Center, LLC (together, "Providers") contend that

limiting the reimbursement of MRI in this way is improper and violates the terms of the insurance contracts between the parties.

Providers move to certify this case as a class action, with themselves as class representatives for all New York MRI service providers similarly situated.  Insurers oppose class certification and move for summary judgment, contending that Providers' claim must be dismissed in light of interpretations of the relevant regulations by DOI and WCB.  In response to Insurers' motion, Providers cross-moved for summary judgment in their favor.

For the reasons that follow, Insurers' motion for summary judgment is granted, Providers' cross-motion for summary judgment is denied, and Providers' motion for class certification is denied as moot.

**BACKGROUND**

The facts are largely undisputed; rather, the parties disagree as to the effect of the prior state court decision rendered in this case, the weight to be afforded certain letters from DOI and WCB, and ultimately the legal interpretation of the applicable regulations.

**A.   Facts**

Providers perform MRIs on individuals injured in car accidents and therefore are eligible for payment of benefits, by assignment, under New York's "No-Fault" insurance law.  (Compl. ¶ 4).

Radiology, which includes MRIs and x-rays (see The Merck Manual of Diagnosis & Therapy 2715-17 (Mark H. Beers, MD et al. eds., 18th ed. 2006) (hereinafter "Merck Manual"),[1] is "a branch of medicine concerned with the use of radiant energy (as X rays) or radioactive material in the diagnosis and treatment of disease," and "the science of radioactive substances and high energy radiations." Merriam-Webster's Collegiate Dictionary 961 (10th ed. 1993) (hereinafter "Merriam Webster"). (See Quadrino Decl. Ex. E (Hamet Aff.) ¶ 4 ("[T]he . . . field of Radiology . . . include[s] x-rays, MRIs, sonograms, ultrasound, and xerioradiography.")). "Radiologic tests can provide images of almost any organ, system, or part of the body in a noninvasive way so that diagnoses can be made and treatment planned or monitored frequently without the need for the patient to undergo exploratory surgery." The American Medical Association Encyclopedia of Medicine 848 (Charles B. Clayman, MD ed. 1989) (hereinafter "AMA Encyclopedia").

MRI is "a noninvasive diagnostic technique that produces computerized images of internal body tissues and is based on nuclear magnetic resonance of atoms within the body induced by the application of radio waves." Merriam Webster, at 698. MRI "provides high quality cross-sectional images of organs

---

[1]    The radiology chapter of the Merck Manual includes the following subheadings:  Computed Tomography ("CT"), MRI, Plain Radiography, Positron Emission Tomography, Radiographic Contrast and Contrast Reactions, Radionuclide Scanning, and Ultrasonography.

and structures within the body without X rays or other
radiation." <u>AMA Encyclopedia</u>, at 699.

During an MRI, "the patient lies inside a massive,
hollow, cylindrical magnet and is exposed to short bursts of a
powerful magnetic field." <u>Id.</u>  The magnetic field lines up the
nuclei of the hydrogen atoms in the patient's body.  <u>Id.</u>  A
strong pulse of radio waves is then emitted, which knocks the
nuclei out of alignment; as the nuclei fall back into alignment
they produce a detectable radio signal.  <u>Id.</u>; <u>see</u> <u>Merck Manual</u>,
at 2716.  "Magnetic coils in the [MRI] machine detect these
signals and a computer changes them into an image based on the
strength of signal produced by different types of tissue"; soft
tissues produce a bright image, while hard tissues, such as bone,
appear black.  <u>AMA Encyclopedia</u>, at 699-700.  "MRI is
preferred . . . when soft-tissue contrast resolution is important
-- e.g., to evaluate intracranial, spinal, or spinal cord
abnormalities or to evaluate suspected musculoskeletal tumors,
inflammation, trauma, or internal joint derangement." <u>Merck</u>
<u>Manual</u>, at 2716-17.

An x-ray is

> any of the electromagnetic radiations of the
> same nature as visible radiation but having
> an extremely short wavelength . . . that is
> produced by bombarding a metallic target with
> fast electrons in vacuum or by transition of
> atoms to lower energy states and that has the
> properties of ionizing a gas upon passage
> through it, of penetrating various
> thicknesses of all solids, of producing
> secondary radiations by impinging on material
> bodies, of acting on photographic films and

> plates as light does, and of causing
> fluorescent screens to emit light.

Merriam Webster, at 1364.  "X rays can be used to produce images

of bones, organs, and internal tissues.  Low doses of X rays are

passed through the tissues and cast images -- essentially shadows

-- onto film or a fluorescent screen."  AMA Encyclopedia, at

1083.

> Each of the body's tissues absorbs X rays in
> a predictable way.  Bones are dense and
> contain calcium; they absorb X rays well.
> Soft tissues -- skin, fat, blood, and muscle
> -- absorb X rays to a lesser extent.  Thus,
> when an arm, for example, is placed in the
> path of an X ray beam, the X rays pass
> readily through the soft tissues but
> penetrate the bones much less easily.  The
> arm casts a shadow on film or a fluorescent
> screen, with the bone appearing white and the
> soft tissues dark gray.

Id.

## B.   New York's No-Fault Insurance Statutory Scheme

New York enacted the Comprehensive Automobile Insurance

Reparations Act (the "No-Fault Law") to promote expedient

resolution of injury claims, limit costs for consumers, and

reduce the need for litigation.  Long Island Radiology v.

Allstate Ins. Co., 830 N.Y.S.2d 192, 193-94 (2d Dep't 2007); 1973

N.Y. Sess. Laws page no. 2335 (McKinney) (Governor's Mem.).  No-

Fault insurance is mandatory as part of every vehicle owner's

liability insurance policy in New York state.  N.Y. Ins. Law §

5103 (McKinney 2006); see DeUrbaez v. Lumbermen's Mut. Cas. Co.,

68 N.Y.2d 930, 932 (1986).

The No-Fault Law provides for prompt payment of "basic economic losses" up to $50,000 per person (subject to certain limitations), and limits litigation to cases involving serious injury.  Long Island Radiology, 830 N.Y.S.2d at 194.  "Basic economic losses" include "[a]ll necessary expenses incurred for" payment of "medical, hospital, surgical, nursing, dental, ambulance, x-ray, prescription drug and prosthetic services." N.Y. Ins. Law § 5102.  The No-Fault Law does not specifically mention MRI.  Id.  The definition of "basic economic losses" does not explicitly cover the expense of MRI.  Id.  Nonetheless, in practice, Insurers have provided coverage for the cost of MRI.

Under the No-Fault Law and its implementing rules and regulations, health care service providers can be assigned first party benefits and receive payment directly from insurance companies.  N.Y. Comp. Codes R. & Regs. tit. 11, § 65-3.11 (2006).

Additionally, the No-Fault Law limits the amount providers can charge for services under the No-Fault scheme.  It provides as follows:

> (a) The charges for services . . . and any further health service charges which are incurred as a result of the injury and which are in excess of basic economic loss shall not exceed the charges permissible under the schedules prepared and established by the chairman of the [WCB] for industrial accidents, except where the insurer or arbitrator determines that unusual procedures or unique circumstances justify the excess charge.
>
> (b) The superintendent, after consulting with the chairman of the [WCB] and the

> commissioner of health, shall promulgate
> rules and regulations implementing and
> coordinating the provisions of this article
> and the workers' compensation law with
> respect to charges for the professional
> health services specified in paragraph one of
> subsection (a) of section five thousand one
> hundred two of this article, including the
> establishment of schedules for all such
> services for which schedules have not been
> prepared and established by the chairman of
> the [WCB].

N.Y. Ins. Law § 5108.  Subsection (c) mandates reporting of

suspected incidents of fraud:  "Every insurer shall report to the

commissioner of health any patterns of overcharging, excessive

treatment or other improper actions by a health provider within

thirty days after such insurer has knowledge of such pattern."

Id.

WCB has created a fee schedule (the "WCB Fee Schedule")

that includes, inter alia, the relative values assigned to

radiological services and applicable payment rules (the "Ground

Rules") for radiology procedures, including x-ray and MRI.  (See

Feltoon Cert. Ex. A ("WCB Fee Schedule")).[2]  The WCB Fee Schedule

has been adopted by DOI.  (See Feltoon Cert. Exs. B, H).

─────────────────────

[2]     In the WCB Fee Schedule all procedures are assigned a
specific "relative value."  (See WCB Fee Schedule).  For all
radiological procedures, "[t]he fee for a procedure or service in
[the Radiology Chapter] is determined by multiplying the relative
value by the radiology conversion factor, subject to the ground
rules, instructions, and definitions of the schedule."  (Id.; see
Hamet Aff. ¶ 9 (relative value "is a multiplier to be used to
establish the cost of the procedure based on complexity")).  The
WCB Fee Schedule's relative values for x-rays are low,
approximately 1-2; the relative values for MRIs are high,
approximately 15-20.  (WCB Fee Schedule).

Each procedure is also assigned a unique billing code,
known as a Current Procedural Terminology ("CPT") code.  (Id.).

1.   **WCB Fee Schedule**

Chapter five of the WCB Fee Schedule is titled "radiology" and is devoted to all radiological procedures.  The chapter includes the Ground Rules and fee codes ("CPT codes") for all radiological services.  (WCB Fee Schedule 1).  The introduction to chapter five states that the definitions and rules contained therein "pertain[] to radiology (including nuclear medicine and diagnostic ultrasound)."  (Id.).

a.   **The Ground Rules**

The Ground Rules are titled "Radiology Ground Rules." (Id.).  Ground Rule 1 states that "[c]onsultations and referrals for diagnostic and therapeutic radiology are to be done only by specialists."  (Id.).

Ground Rule 3 is titled "Multiple Diagnostic X-Ray Procedures."  (Id.).  It does not explicitly refer to MRI.  (See id.).  This Rule provides in pertinent part:

> The following adjustments apply:
>
> (a) For two contiguous parts, the charge shall be the greater fee plus 50 percent of the lesser fee.
>
> (b) For two remote parts, the charge shall be the greater fee plus 75 percent of the lesser fee.  Bilateral procedures are considered remote parts.
>
> (c) For three or more parts, whether contiguous or remote, the charge shall be the greatest fee plus 75 percent of the total of the lesser fees.
>
> . . . .

> (f) X-rays of different areas taken on
> different but proximate dates and related to
> the injury or problem necessitating the first
> x-ray studies, and which could have
> reasonably been performed at one time, shall
> be subject to rules . . . above.

(Id. at 1-2).  In essence, these rules provide for discounting of the relative values prescribed by the WCB Fee Schedule when multiple body parts are, or could have been, imaged in one session.  Additionally, Ground Rule 5 is applicable to "multiple services other than diagnostic radiology," and states that "[w]hen multiple or bilateral procedures or services are provided at the same session, payment is for the procedure with the highest allowance plus half of the lesser procedures up to a total maximum allowance of twice the highest fee."  (Id.).

The only Rule explicitly referring to MRI is Ground Rule 11, "contrast enhanced magnetic resonance imaging."  (Id. at 3).  This Rule provides in pertinent part that "[c]ontrast materials provided by the physician over and above those usually included with the service, for image enhancement, may be charged for separately."[3]  (Id.).

### b.  The CPT Codes

The CPT codes included at the end of chapter five include codes for all radiological services, including x-ray and MRI.  (Id. at 5-18).  For the most part, codes for x-ray, MRI,

---

[3]     The Ground Rules also contain a directive on xeroradiography imaging.  (WCB Fee Schedule 2 ("Imaging performed by this process shall have the identical values listed for conventional x-ray procedures of the same area and views.")).

and CT procedures performed on the same or similar body parts are grouped together in the list of codes.  (Id.).  For example, CPT code 72170 is the billing code for radiologic, or x-ray, examination of the pelvis with one or two views; the next code is 72190, for x-rays of the pelvis with a minimum of three views. (Id. at 8).  The next code in sequence is 72191, for a CT of the pelvis, followed by codes 72192-94, all for CT scans of the pelvis.[4]  (Id.).  Following these are codes 72195-98, all for MRIs of the pelvis.[5]  (Id.).

        For some body parts, there are many more codes listed for x-ray than for MRI or CT.  As an example, there are eleven different CPT codes for x-rays of different parts of an arm: codes 73070, 73080, and 73085 for an elbow; codes 73090 and 73092 for a forearm; codes 73100, 73110, and 73115 for a wrist; 73120 and 73130 for a hand; and 73140 for a finger.  (Id. at 9).  Next in the CPT code sequence are codes for CT and MRI of an "upper extremity"; there are four codes for CTs of an "upper extremity," differentiated by whether they use contrast or other materials, and seven codes for MRIs of an "upper extremity," likewise differentiated by whether they use contrast or other materials and whether the MRI is of a joint or not.  (Id.).

---

        [4]    These scans are variously with or without contrast material, and different types of follow up.  (WCB Fee Schedule 8).

        [5]    Likewise, these are codes for different types of MRI of the pelvis.  (Id.).

2.  **Letters from New York State Agencies**

    a.  **Letters from DOI**

On August 27, 2003, in reply to a query from Vicki

Dunbar, Medical Data Coordinator of Mitchell Medical,[6] Eddie

Clemetson, Senior Insurance Examiner in the Property Bureau of

DOI, wrote as follows (the "Clemetson Letter"):

> The [DOI] has adopted the [WCB] Medical
> Fee Schedule to be used by health care
> providers when billing for No-fault services.
> Therefore, the WCB general instructions and
> ground rules apply except for rules which
> refer to workers' compensation claim forms,
> preauthorization approval, and dispute
> resolution guidelines.  MRI is a diagnostic
> procedure and it is our view, after
> consultation with the [WCB], that the payment
> adjustment guidelines contained in WCB
> radiology ground rule No. 3 are applicable.
>
> We trust that the foregoing information
> is of assistance to you.

(Feltoon Cert. Ex. B).  Dunbar had inquired by telephone and e-

mail about whether MRI is "subject to the Workers' Compensation

Board (WCB) Radiology ground rule No. 3."  (Id.).  In September

2005, Skip Short, Esq., counsel to several defendants in this

case, inquired whether Clemetson "ha[d] the authority to sign an

opinion letter issued by [DOI's] Property Bureau."  (Id. Ex. D).

Joe Smeragliuolo, Supervising Insurance Examiner of the Property

Bureau of DOI, responded in writing that "[a]s an employee of

[DOI] and a Senior Insurance Examiner in the Property Bureau, Mr.

---

[6]     Neither party provides information as to Dunbar's or
Mitchell Medical's relation, if any, to the parties in this case.
Defendants do not explain how they obtained this letter.

Clemetson is authorized to issue and sign letters on behalf of [DOI]."  (<u>Id.</u>).

On June 27, 2006, Short wrote to Mark Presser, DOI Assistant Deputy Superintendent and Chief Examiner, Property Bureau.  (<u>Id.</u> Ex. G).  He requested a formal opinion as to whether Ground Rule 3 applies to MRI.  (<u>Id.</u>).  Presser replied on July 5, 2006 (the "Presser Letter").  (<u>Id.</u> Ex. H).  His letter states, <u>inter alia</u>:

> In administering the No-Fault law, [the DOI] rel[ies] upon the advice of the WCB and consult[s] with that agency for guidance. From our consultation with the WCB, we are aware that said agency has determined that MRI is subject to WCB Radiology Ground Rule No. 3.  Accordingly, it is our advice to insurers that MRI is subject to this fee schedule ground rule under the No-Fault system.

<u>Id.</u>

### b.  **Letters from WCB**

On May 17, 2005, in response to an inquiry from a lawyer, Cheryl M. Wood, General Counsel to WCB, wrote to Crystal Kastberg of the Medical Claims Department of Progressive Insurance, regarding the applicability of the Radiology Ground Rules to MRI (the "Wood Letter").[7]  (<u>Id.</u> Ex. C).  Progressive Insurance's lawyer had "requested written confirmation that WCB Ground Rule Number 3 is applicable to MRI's."  (<u>Id.</u>).  This letter from the WCB states in pertinent part:

---

[7]   Progressive Insurance entities are defendants in this case.

> Radiology Ground Rule #3, Multiple Diagnostic X-Ray Procedures, provides guidelines on how to compute reimbursement for diagnostic radiology services. Accordingly MRI's would be subject to Ground Rule 3.
>
> It is important to remember that this discussion is provided for informational purposes only.  Only the Board in the exercise of its adjudicatory function is authorized to determine entitlement to benefits based on the specific facts of a given claim and the application of the law to those facts.

(Id.).  The letter was copied to Progressive's lawyer and to a Deputy Director of Regulatory Affairs.  (Id.).

On April 28, 2006, in response to another inquiry from Dunbar on behalf of Mitchell Medical about whether Ground Rule 3 applies to MRI, Patricia Furdyna, a registered nurse and Medical Care Representative with the Bureau of Health Management of WCB, stated that "Ground Rule #3 applies to codes 70010-76499.  Ground Rule 5 applies to all other codes" (the "Furdyna Letter").  (Id. Ex. F, at 2).  Codes 70010-76499 include all MRI procedures. (See WCB Fee Schedule 5-18).  Furdyna further stated that Ground Rule 3 applies to "both [MRI] as well as [CT] procedures." (Feltoon Cert. Ex. F, at 2).  At the outset of her letter, Furdyna stated that the information contained therein is "for informational purposes only and is based on an interpretation pursuant to the Workers' Compensation Law," and furthermore that "No-Fault cases may be subject to different interpretations." (Id. at 1).

### 3.   __The State Court Decision__

Providers filed their original complaint in this case against most of the parties now before this Court as named defendants, in New York State Supreme Court, New York County, in August 2004.  Brentwood Pain & Rehab. Servs., P.C. v. Metro. Prop. & Cas. Ins. Co., No. 111641/04, slip. op. at 2, 4-5 (N.Y. Sup. Ct. Mar. 28, 2006).  An amended complaint subsequently was filed.  See id.  In October 2005, certain defendants moved to dismiss the amended complaint for failure to state a cause of action.  Id. at 1.

On March 28, 2006, in an unpublished decision, New York State Supreme Court Justice Joan A. Madden denied defendants' motion to dismiss the amended complaint.  Id. at 8.  Defendants had submitted the Clemetson Letter and the Wood Letter in support of their contention that both DOI and WCB "have expressly interpreted Ground Rule 3" as applicable to MRIs.  Id. at 11.  Judge Madden rejected defendants' argument.  She relied on:  (1) her view of the plain meaning of the words, as supported by an affidavit of Dr. Marc Hamet (submitted by plaintiffs), that "x-ray" and "MRI" were generally understood to be two different procedures (id. at 17); (2) two prior New York state court decisions, Berger v. New York State Department of Social Services, 585 N.Y.S.2d 238 (3d Dep't 1992), and Williamsbridge Imaging Baraz Radiology, P.C. v. State Farm Insurance Co., No. 119526/02, slip. op. (N.Y. Civ. Ct. Oct. 14, 2003) (id. at 16-17); (3) her view that the Clemetson Letter was insufficient

because it was not written by "'[t]he superintendent, deputy
superintendents, the department counsel [or] bureau heads' who
are individuals authorized under the applicable regulations to
write formal opinions" (id. at 14 (quoting N.Y. Comp. Codes R. &
Regs. tit. 11, § 2.5) (brackets in original)); and (4) her view
that the Wood Letter was insufficient because WCB is an
adjudicatory agency, and therefore a general opinion letter, even
issued by WCB's general counsel, was not binding but rather only
informational.  (Id. at 15).

        Judge Madden held that the agency letters "submitted in
support of the motion to dismiss are insufficient to demonstrate
that the Superintendent of Insurance or the WCB have interpreted
Ground Rule 3b to apply to MRI's."  (Id. at 14).  She went on to
state that "even if the DOI letter constituted the informal
opinion of DOI, it would not be entitled to the kind of deference
afforded to regulations promulgated by the Superintendent of
Insurance," and, furthermore, "even assuming that the DOI and WCB
letters were considered to be the agencies' interpretation of
Ground Rule 3-b, such interpretation is not entitled to deference
to the extent it is unreasonable, particularly as the term "x-
ray" is not a technical term within the agencies' expertise."
Id. at 16 (citing Berger, 585 N.Y.S.2d at 240).  Judge Madden
concluded that "at least at this juncture" -- a non-final ruling
on a motion to dismiss for failure to state a claim -- "an
interpretation of the term x-ray to extend to all radiological

procedures, including MRI's, is unreasonable and, thus, not entitled to deference." Id. at 17.

**B.**   **Procedural History**

Following Judge Madden's decision in March 2006, on May 24, 2006 Insurers removed the case to this Court pursuant to the Class Action Fairness Act.  28 U.S.C. § 1332(d)(2).

Providers moved for class certification on December 18, 2006.  Thereafter, a discovery dispute arose about certain third-party documents, requiring Court intervention.  Upon resolution of this matter, Insurers filed their opposition to the class certification motion on June 29, 2007.  That same day they moved for summary judgment.  On July 26, 2007, Providers filed their opposition to Insurers' motion for summary judgment, simultaneously cross-moving for summary judgment in their favor on the applicability of Ground Rule 3 to MRIs.  The following day, on July 27, 2007, Providers filed their reply in further support of their motion for class certification.  On August 9, 2007, Insurers filed their reply in further support of their motion for summary judgment.

Insurers contend that Providers' claim should be dismissed as a matter of law, because the letters from DOI and WCB representatives unequivocally state that Radiology Ground Rule 3 should be applied to MRIs, and these interpretations are entitled to deference.  As an initial matter, Providers contend that the significance of the letters cannot be re-litigated before this Court, because Judge Madden determined that they are

not dispositive, and the law of the case doctrine bars relitigation of the issue.  In any event, Providers contend that the letters should not be afforded deference, and that Ground Rule 3 does not apply to MRI.

For the reasons that follow, Insurers' motion for summary judgment is granted, and Providers' cross-motion is denied.  Providers' motion for class certification is rendered moot, and accordingly is denied.

## DISCUSSION

### A.   Summary Judgment Standard

The standards governing motions for summary judgment are well-settled.  A court may grant summary judgment only where there is no genuine issue of material fact and the moving party is therefore entitled to judgment as a matter of law.  See Fed R. Civ. P. 56(c); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 585-87 (1986).  Accordingly, the court's task is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).  To create an issue for trial, there must be sufficient evidence in the record to support a jury verdict in the nonmoving party's favor.  See id.

To defeat a motion for summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts."  Matsushita, 475 U.S. at 586.  As the U.S. Supreme Court held in Anderson, "[i]f

the evidence is merely colorable, or is not significantly probable, summary judgment may be granted." Anderson, 477 U.S. at 249-50 (citations omitted). The nonmoving party may not rest upon mere conclusory allegations or denials, but must set forth "concrete particulars" showing that a trial is needed. Nat'l Union Fire Ins. Co. v. Deloach, 708 F. Supp. 1371, 1379 (S.D.N.Y. 1989) (quoting R.G. Group, Inc. v. Horn & Hardart Co., 751 F.2d 69, 77 (2d Cir. 1984) (internal quotations omitted)). Accordingly, it is insufficient for a party opposing summary judgment "merely to assert a conclusion without supplying supporting arguments or facts." BellSouth Telecomms., Inc. v. W.R. Grace & Co., 77 F.3d 603, 615 (2d Cir. 1996) (quotations omitted).

**B.    Law of the Case Doctrine**

Providers contend that the applicability of Ground Rule 3 cannot be re-litigated now, because Judge Madden, deciding a motion to dismiss in this case, concluded "at th[at] juncture" that Ground Rule 3 does not apply to MRIs (Brentwood, at 17), creating law of the case. The argument is rejected.

"Unlike the more precise requirements of res judicata, law of the case is an amorphous concept." Arizona v. California, 460 U.S. 605, 618 (1983). Under the law of the case doctrine, a decision on an issue of law becomes binding precedent in subsequent stages of the same litigation. In re PCH Assocs., 949 F.2d 585, 592 (2d Cir. 1991). It authorizes departure from a prior ruling, however, when there has been an intervening change

of controlling law, new evidence becomes available, or there is a "need to correct a clear error or prevent manifest injustice." Virgin Atl. Airways v. Nat'l Mediation Bd., 956 F.2d 1245, 1255 (2d Cir. 1992) (citations omitted).  Moreover, as the Second Circuit held in Quinn v. Aetna Life & Cas. Co., law of the case is discretionary, "even when the case is one transferred from state to federal court."  616 F.2d 38, 40-41 (2d Cir. 1980) (citing Hill v. U.S. Fid. & Gaur. Co., 428 F.2d 112, 114 (5th Cir. 1970) ("A final decision of a state trial court is not binding on the federal courts as a final expression of state law.")).

Providers contend that because Insurers did not appeal but rather removed the case to this Court, Judge Madden's decision, which was a "non-final disposition" (Quadrino Decl. Ex. B), thus became "final."  (Pls.' Mem. of Law in Opp. to Mot. for Summ. J. & in Supp. of Cross-Mot. for Partial Summ. J. ("Pl. Mem.") 4).  This is incorrect.  While a party proceeding in New York Supreme Court may appeal an interlocutory decision to the Appellate Division as of right, it has no obligation to do so. See N.Y. C.P.L.R. § 5701 (McKinney 2006).  That Insurers chose to pursue other avenues of litigation does not transform an interlocutory, non-final disposition into a final one.

The law of the case doctrine does not bar reconsideration of the issues.  Judge Madden's decision was rendered in the context of a motion to dismiss the complaint; her decision to permit the case to proceed beyond the pleadings stage

was not dispositive.  Judge Madden merely held that, as a
pleading matter, the complaint stated a cause of action.
Moreover, Judge Madden was presented with only the Clemetson and
Wood Letters, and she did not have the benefit of the additional
letters that have been submitted to this Court.  In light of
these circumstances and my own analysis of the issues, I decline
to apply the law of the case doctrine.

C.   **Application of Ground Rule 3 to MRI**

        Providers and Insurers' ultimate point of contention is
whether Ground Rule 3 applies to MRI.  Insurers argue that
because DOI and WCB -- the agencies charged with interpreting the
relevant statutes and regulations -- have interpreted Ground Rule
3 to apply to MRI, and because this interpretation is not
unreasonable, this Court should defer to that determination.
Providers contend that from the plain language of the regulation
Ground Rule 3 does not apply to MRI, that x-rays and MRI are very
different, and that even assuming DOI and WCB have interpreted
Ground Rule 3 to apply to MRI, this interpretation should not be
afforded deference.

        Federal courts sitting in diversity are bound by the
substantive law of the forum state.  See Travelers Ins. Co. v.
633 Third Assocs., 14 F.3d 114, 119 (2d Cir. 1994) (citations
omitted).  Where state law is ambiguous, the federal court must
predict how the highest state court would decide the issue.  See
id.  Whether Ground Rule 3 of the WCB Fee Schedule applies to MRI
is not clear, for the New York State Court of Appeals has not

addressed the issue.  Accordingly, this Court must predict how the Court of Appeals would rule.  In so doing, the Court must "carefully review available resources," including, <u>inter alia</u>, the language of relevant statutes and regulations, agency interpretations, legislative history, and lower state court rulings.  <u>Id.</u>  (citations and quotation marks omitted); <u>see also Phansalkar v. Andersen Weinroth & Co.</u>, 344 F.3d 184, 199 (2d Cir. 2003).  I consider these factors in turn and I conclude by considering the reasonableness of the agencies' interpretation.

###### 1. __The Language of the Statute and Rule__

The No-Fault Law requires that all vehicle owners have No-Fault insurance, and covers "basic economic loss" up to fifty thousand dollars, explicitly including expenses incurred for "medical, hospital, surgical, nursing, dental, ambulance, x-ray, prescription drug and prosthetic services," and "any other professional health services."  N.Y. Ins. Law §§ 5102-03. Section 5108 provides that charges be limited under the WCB Fee Schedule, and contains a provision intended to combat fraud.  <u>Id.</u> § 5108.

Chapter five of the WCB Fee Schedule is titled "Radiology."  (WCB Fee Schedule 1).  Ground Rule 3 of the Radiology Ground Rules, contained in chapter five, is titled "multiple diagnostic x-ray procedures," and sets out the billing rules discussed above.  (<u>Id.</u>).  This Rule does not make any mention of MRIs.[8]  (<u>See</u> <u>id.</u>).

---

[8]    The Radiology chapter also includes a rule specifically applicable to xeroradiography (Rule 4), stating that

The Radiology chapter does contain a Ground Rule that explicitly applies to MRI, Ground Rule 11.  Titled "contrast enhanced magnetic resonance imaging," Ground Rule 11 provides, in pertinent part, as follows:  "Contrast materials provided by the physician over and above those usually included with the service, for image enhancement, may be charged for separately."  (WCB Fee Schedule 3).

Providers contend that I should look to the plain language of the Ground Rules and no further, and that this will compel the conclusion that Ground Rule 3 cannot be applied to MRI.  (Pl. Mem. 6).  In support of their argument, they observe that Ground Rule 3 uses the term x-ray, and not MRI or any other radiological term, and that there is a Rule, Ground Rule 11, that specifically mentions MRI.  Providers claim that had the drafters of the Ground Rules meant for Rule 3 to apply to MRIs, they would have included this term in the text of the Rule.  (Id. at 6, 10).  Providers also note that the relative values for MRI contained in the WCB Fee Schedule are substantially greater than those for x-rays.  (Id. at 11; see WCB Fee Schedule 5-18).

Providers, of course, are correct that Ground Rule 3 does not mention MRI, but rather uses the term "diagnostic x-ray."  (See WCB Fee Schedule 1).  I conclude, however, in light

xeroradiography "[i]maging . . . shall have the identical values listed for conventional x-ray procedures of the same area and views."  (Id. at 2).  Xeroradiography is "radiography used esp[ecially] in mammographic screening for breast cancer that produces an image using X rays in a manner similar to the way an image is produced by light in xerography."  Merriam Webster, at 1364.

- 23 -

of all the evidence now before me that the applicability of
Ground Rule 3 to MRI is ambiguous and, therefore, that the
inquiry cannot rest upon the plain language.  Although Rule 3
does not explicitly mention MRI, Rule 3 is contained in a chapter
that covers all forms of radiology, including, as the CPT codes
at the end of the chapter show, MRI.  Moreover, as for the
reasons discussed below, there is no reason to treat MRI and x-
rays differently for these purposes.  Indeed, as the Second
Circuit recently held, even where a statute at first glance
appears to mean one thing,

> interpretation of a statute is not in all
> circumstances limited to any apparent "plain
> meaning."  As Justice Holmes has observed,
> "[i]t is said that when the meaning of
> language is plain we are not to resort to
> evidence in order to raise doubts.  That is
> rather an axiom of experience than a rule of
> law, and does not preclude consideration of
> persuasive evidence if it exists."

Hayden v. Pataki, 449 F.3d 305, 315 (2d Cir. 2006) (quoting
Boston Sand & Gravel Co. v. United States, 278 U.S. 41, 48
(1928)).

### 2.  **Agency Interpretations**

The New York Court of Appeals "has made clear [that]
'the interpretation given to a regulation by the agency which
promulgated it and is responsible for its administration is
entitled to deference if that interpretation is not irrational or
unreasonable.'"  Council of the City of N.Y. v. Pub. Serv.
Comm'n, 99 N.Y.2d 64, 74 (2002) (quoting Gaines v N.Y. State Div.
of Hous. & Cmty. Renewal, 90 N.Y.2d 545, 548-49 (1997)).  With

respect to the DOI Superintendent, it is a "well-established principle of administrative law that the [DOI] Superintendent's 'interpretation, if not irrational or unreasonable, will be upheld in deference to his special competence and expertise with respect to the insurance industry, unless it runs counter to the clear wording of a statutory provision.'"  State Farm Mut. Auto Ins. Co. v. Mallela, 4 N.Y.3d 313, 321 (2005) (quoting N.Y. Pub. Interest Research Group v. N.Y. State Dep't of Ins., 66 N.Y.2d 444, 448 (1985)).

Insurers contend that the letters from DOI and WCB are owed this deference.  Providers argue that (1) these letters do not constitute formal or informal opinions under the applicable rules and regulations, and (2) even assuming they do, they are not owed deference by this Court.

Title 11, section 2.5 of New York state's Official Compilation of Codes, Rules and Regulations (the "State Regulations") provides that the DOI "superintendent, all deputy superintendents, the department counsel, and bureau heads may give written opinions."  N.Y. Comp. Codes R. & Regs. tit. 11, § 2.5.  The regulation further states that the "usual procedure to be observed" is as follows.

> (a) The relevant statutes, regulations, orders, and prior opinions should be consulted.
>
> (b) In case the proposed opinions will conflict with any other known opinion or with any regulation or practice of the Insurance Department, the department counsel or a deputy superintendent should be consulted.

(c) The person requesting the opinion, or to be affected thereby, should be required to give a statement of the relevant facts, and of the reasons why the opinion is requested, and if it is to be recorded and indexed as hereinafter provided, a concise summary of the facts should be stated in the opinion and the relevant sections of the Insurance Law should be cited.

(d) The scope of the opinion should be confined to the facts and reasons presented except where the opinion is intended to cover a question of general application.

(e) The scope of the opinion should not be broader than the scope of the powers and duties of the official or employee giving the same.

(f) If an opinion is deemed to be sufficiently important as a guide to the future action of the Insurance Department to justify keeping a permanent record thereof, the opinion shall be filed and retained in accordance with internal department procedures.

Id. An "opinion," as defined by section 1.3 of this chapter,

is an informal statement of the interpretation or construction of any law or official regulation of the superintendent, in reference to a particular situation involving the exercise of any authority of the superintendent under the Insurance Law, when made by an official or salaried employee of the Insurance Department in the regular course of his or her duties.

Id. § 1.3.

Insurers have submitted two letters from WCB advising that Ground Rule 3 applies to MRI, drafted in 2005 and 2006. (Feltoon Cert. Exs. C, F).  The Wood Letter, authored by the General Counsel of WCB, states that Ground Rule 3 "provides guidelines on how to compute reimbursement for diagnostic

radiology services," and that therefore "MRI's would be subject
to Ground Rule 3." (Id. Ex. C (emphasis added)). Although the
Wood Letter also states that it is "for informational purposes
only," it makes clear that the WCB -- the agency that promulgated
the WCB Fee Schedule -- reads Ground Rule 3 to apply to all
diagnostic radiological services, including MRI, despite the
Rule's exclusive use of the term "x-ray." (See id.). The
Furdyna Letter also provides an informational interpretation from
WCB of the WCB Fee Schedule, and advises that "Radiology Ground
Rule #3 does apply to both [MRI] as well as [CT] procedures," and
to all Radiology procedures with CPT codes 70010-76499. (Id. Ex.
F, at 2).

    Plaintiffs complain that these WCB letters cannot
constitute an "opinion," because the WCB is exclusively an
adjudicatory agency. (Pl. Mem. 12). Even assuming the WCB is
exclusively an adjudicatory agency and the WCB letters cannot be
"opinions," the letters are still highly relevant. Moreover, the
views set forth in these letters were adopted by DOI, as
reflected in the Clemetson and Presser Letters. (Feltoon Cert.
Exs. B, H).

    The Clemetson Letter, written in 2003, was authored by
a senior insurance examiner in DOI's Property Bureau. (Id. Ex.
B). The Presser Letter, written in 2006, was authored by an
assistant deputy superintendent. (Id. Ex. H). Both state that
Ground Rule 3 is applicable to MRI. Providers' primary objection
to these letters is that they are not "opinions" because they are

not similar in form to the examples of formal and informal
opinions of DOI that they have submitted in support of their
opposition to summary judgment, and that are available on the DOI
website.  (Pl. Mem. 12-14; see Quadrino Decl. Exs. C, D).

Providers' argument about the form of the letters must
be rejected.  While they correctly observe that the letters
submitted by Insurers look different than the formal and informal
opinion letters available on the DOI website, they proffer
nothing to support their contention that the letters are not
"what defendants purport them to be," or that they are somehow
"newly manufactured evidence."  (Pl. Mem. 12, 1).  Nothing in
title 11 of the State Regulations requires that formal or
informal opinions issued by DOI take any particular form.  See
N.Y. Comp. Codes R. & Regs. tit. 11, §§ 1.3, 2.5.  Providers,
furthermore, have offered nothing -- other than unsupported
speculation and allegations[9] -- that would even suggest that the
letters were not written "by an official or salaried employee of
the Insurance Department in the regular course of his or her
duties."  Id. § 1.3.

Consequently, I can only conclude that these letters
are opinions of DOI within the meaning of the State Regulations.

---

[9]     Providers' wholly unsupported suggestion in their
memorandum of law that Mr. Clemetson is a "friend[]" of the
defendants and their repeated references to him and other state
agency employees solely by their first names are entirely
improper.  (Pl. Mem. 1-2).  Likewise, Providers' apparent attempt
to derogate a WCB employee with the factually unsupported claim
that four years ago she worked as a "part-time school nurse,"
whether true or untrue, is of no consequence whatsoever.  (Id. at
13).

Although Providers contend that "courts have not been shy about rejecting the 'opinions' of agencies" where appropriate, the facts of the cases they cite in support of this proposition are easily distinguishable, and not on all fours as Providers contend.  (See Pl. Mem. 13-14 (citing Das v. Allstate Ins. Co., 746 N.Y.S.2d 262 (2d Dep't 2002) (affirming reversal of arbitrator decision); Kew Gardens Imaging v. Liberty Mut. Ins. Co., 798 N.Y.S.2d 345 (N.Y. Civ. Ct. 2003) (vacating arbitrator's decision on burden of proof issue); Park Radiology P.C. v. Allstate Ins. Co., 769 N.Y.S.2d 870 (N.Y. Civ. Ct. 2003) (declining to follow informal opinion of DOI Superintendent on timeliness issue in light of supervening case law))).  Additionally, it is significant that Insurers proffer evidence that DOI and WCB have interpreted Ground Rule 3 as applicable to MRI since at least 2003.  (See Feltoon Cert. Exs. B, C, F, H).

For the above reasons, if DOI's interpretation of Ground Rule 3 as applicable to MRI is not unreasonable, it must be afforded deference.  See State Farm Mut. Auto Ins. Co., 4 N.Y.3d at 321.

### 3.   **Legislative History**

New York's No Fault Law provides mandatory and universal coverage of basic economic losses to vehicular accident victims, and is intended to expedite resolution of claims, limit costs, and reduce litigation.  See N.Y. Ins. Law § 5103; Long Island Radiology, 830 N.Y.S.2d at 193-94; 1973 N.Y. Sess. Laws

page no. 2335 (McKinney) (Governor's Mem.).  Inclusion of MRI
under Ground Rule 3 would further these purposes.

### 4.   **State Cases**

Providers rely on two New York state lower court
decisions.

In a 2003 decision of New York Civil Court, Queens
County, the issue presented was the same as that presented here:
Whether Radiology Ground Rule 3 applies to MRI.  Williamsbridge
Imaging Barax Radiology, P.C., No. 119525/02, slip op. at 1.
That court conducted a trial, and the "sole witness[es]" were a
billing manager of plaintiff and a claims adjustor of defendant.
Id.  In its decision, the court acknowledged that deference is
owed to agency interpretations, but stated that "there being no
relevant decisions or opinions issued by the Worker's
Compensation Board, as per rules of statutory construction, the
ordinary meaning of the words should be applied absent clear
intent by the promulgating agency otherwise."  Id. (emphasis
added).  Ultimately the court ruled in plaintiff's favor,
awarding $598.67, plus interest and attorneys' fees.  Id. at 2.

Providers also rely on Berger, an Appellate Division,
Third Department decision from 1992, regarding Medicaid
reimbursement for sonogram, or ultrasound, procedures.  585
N.Y.S.2d at 238.  In that case plaintiff, a physician, had billed
sonograms performed on the same patient on the same day at the
full fee.  Id. at 239.  The Department of Social Services ("DSS")
contended that these procedures should have been billed at a

discounted rate pursuant to a Medicaid rule similar to Radiology
Ground Rule 3.  Id. (rule titled "Multiple X-Ray Exams," and
providing that "[w]hen more than one x-ray exam is performed
during the same visit, use the usual fee code for the primary
procedure and identify the secondary procedure(s) by adding the
modifier '-62' to the procedure number(s).  (Reimbursement will
not exceed 60% of the maximum State Medical Fee Schedule
amount).").  The court in Berger held that "x-ray" was not a
technical term within the area of expertise of DSS, the
interpreting agency, and that therefore DSS's interpretation
should not be afforded deference.  Id. at 240.  Next, the court
found that the terms "x-ray" and "sonogram" were commonly
understood to mean two different procedures.  Id.  Looking to the
plain wording of the statute, the court thereby concluded that
the discounting rule should not apply to sonograms.  Id.

        While this Court must give "proper regard" to state
court rulings, these lower state court decisions are not
controlling.  See Travelers Ins. Co., 14 F.3d at 119.  With
respect to Williamsbridge, that court affirmatively stated that
it did not have any agency opinion letters, formal or informal,
before it.  This Court, however, has been presented with
materials from both WCB and DOI opining that Ground Rule 3 should
be applied to MRIs.  And, although the rule at issue in Berger is
similar to Ground Rule 3, that case concerned DSS instead of DOI,
and sonograms instead of MRIs.  In light of all the evidence

before this Court, these cases are not persuasive, and do not render the agency interpretations unreasonable.

### 5. The Reasonableness of DOI's Interpretation

I conclude that DOI's interpretation of Ground Rule 3 is reasonable.

First, although Rule 3 does not specifically mention MRI, it makes sense to apply it to MRI. Although there are differences in the technology, the function of an MRI and an x-ray is the same -- a diagnostic procedure to "see" inside the body without exploratory surgery.[10]

Second, the goals of the No-Fault Law are to limit cost, expedite claim resolution, and limit litigation. X-rays and MRI play similar roles, and treating them the same way for billing purposes will further those goals.

Third, I observe that DOI, WCB, and Insurers do not dispute that MRI is a more costly procedure than an x-ray, as reflected by the relative values of the WCB Fee Schedule. Indeed, the relative value assigned to an MRI is ten to twenty times that assigned to an x-ray. (See WCB Fee Schedule). What the interpreting agencies advocate, and what Insurers are doing, is discounting the fee charged for contiguous or remote parts. (See id. at 1). This discounting furthers two goals of the No-

---

[10]    In the Merck Manual, CT, MRI, positron emission tomography (or "PET" scans), radionuclide scanning, ultrasonography (encompassing ultrasounds and sonograms), and "plain radiography" or x-rays, all fall under the chapter titled "Principles of Radiologic Imaging." Merck Manual, at 2715-19.

Fault statute:   reducing cost to consumers and discouraging fraud.   See N.Y. Ins. Law § 5108; 1973 N.Y. Sess. Laws. page no. 2335 (McKinney) (Governor's Mem.).

Finally, the No-Fault Law is built on a delicate balancing of different interests:   Insurance companies are required to provide certain coverage, without regard to fault, but at the same time the charges for covered services are limited by schedules set by WCB and adopted by DOI.   WCB created Ground Rule 3 and DOI adopted it.   It is their considered, longstanding opinion that Ground Rule 3 encompasses MRI.   That interpretation is entirely rational, and is entitled to deference.

## CONCLUSION

For the above reasons I conclude that DOI's interpretation is not irrational or unreasonable, and is entitled to deference.   I conclude that the interpretation of Ground Rule 3 as limiting charges for MRI should be upheld.   Consequently, plaintiffs' claim must be dismissed as a matter of law, and their motion for class certification therefore must be denied as moot.

For the foregoing reasons, defendants' motion for summary judgment is granted.   The Clerk of the Court shall enter judgment accordingly, and close this case.

SO ORDERED.

Dated:   New York, New York
        September 14, 2007

DENNY CHIN
United States District Judge

- 33 -

## APPEARANCES

For Plaintiffs Brentwood Pain & Rehabilitation Services, P.C.,
and Hempstead Pain & Medical Services, P.C.:

        QUADRINO & SCHWARTZ, P.C.
            By:  Richard J. Quadrino, Esq.
        666 Old Country Road
        Garden City, New York  11530

For Plaintiff Signature Health Center, LLC:

        HESSION, BEKOFF & COOPER, LLP
            By:  Andrew Paul Cooper, Esq.
        1103 Stewart Avenue, Suite 200
        Garden City, New York 11530

        STILLMAN & FRIEDMAN, P.C.
            By:  Paul Schectman, Esq.
                Glen Kopp, Esq.
        425 Park Avenue
        New York, New York  10022

For Defendants Allstate Insurance Company, AIU Insurance Company,
American Transit Insurance Company, Eagle Insurance Company,
Halcyon Insurance Company, Liberty Mutual Insurance Company,
Lumbermens Mutual Casualty Group, National Grange Mutual
Insurance Company, Nationwide Mutual Insurance Company,
Progressive Casualty Insurance Company, Progressive Northeastern
Insurance Company, Progressive Northern Insurance Company,
Progressive Northwestern Insurance Company, Progressive Specialty
Insurance Company, State Farm Mutual Automobile Insurance
Company, and St. Paul Travelers:

        CONRAD O'BRIEN GELLMAN & ROHN, P.C.
            By:  Robert N. Feltoon, Esq.
        1515 Market Street, 16th Floor
        Philadelphia, Pennsylvania  19102

        SHORT & BILLY, P.C.
            By:  Skip Short, Esq.
        217 Broadway
        New York, New York  10007

        RIVKIN RADLER LLP
            By:  Evan H. Krinick, Esq.
                Michael Versichelli, Esq.
        926 RexCorp Plaza
        Uniondale, New York  11556

CARMAN, CALLAHAN & INGHAM, LLP
        By:  James M. Carman, Esq.
266 Main Street
Farmingdale, New York  11735

CAHILL, GORDON & REINDEL, LLP
        By:  Adam Zurofsky, Esq.
             Jason Otto, Esq.
             Kayvan Sadeghi, Esq.
80 Pine Street
New York, New York  10005

LAZARE POTTER GIACOVAS & KRANJAC, LLP
        By:  Stephen M. Lazare, Esq.
             Michael Versichelli, Esq.
950 Third Avenue
New York, New York  10022

MCDONNELL & ADELS, P.C.
        By:  Elizabeth Adels, Esq.
401 Franklin Avenue
Garden City, New York  11530

STERN & MONTANA LLP
        By:  Robert A. Stern, Esq.
115 Broadway
New York, New York  10006

FOWLER WHITE BOGGS BANKER
        By:  W. Donald Cox, Esq.
             John P. Marino, Esq.
501 East Kennedy Boulevard, Suite 1700
Tampa, Florida  33601

SHAPIRO, BEILLY, ROSENBERG, ARONOWITZ, FOX, LLP
        By:  Barry S. Cohen, Esq.
225 Broadway, 13th Floor
New York, New York  11556

SONNENSCHEIN NATH & ROSENTHAL LLP
        By:  Deborah Renner, Esq.
1221 Avenue of the Americas
New York, New York  10020

HAVKINS ROSENFELD RITZERT & VARRIALE, LLP
        By:  Aaron M. Schlossberg, Esq.
11 Penn Plaza, Suite 2101
New York, New York  10001